IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| B. L., | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 07-435-JO |
| | ) | |
| v. | ) | <u>O R D E R</u> |
| | ) | |
| ARCHDIOCESE OF PORTLAND IN OREGON, | ) | |
| | ) | |
| Defendant. | ) | |

JONES, Judge:

By Order entered March 15, 2007, this court withdrew the reference to the bankruptcy court of Claim No. 95, together with 22 other unresolved claims, for the limited purpose of estimating, pursuant to 11 U.S.C. § 502(c)(1), this claim for plan confirmation purposes.

On March 28, 2007, I issued a final Order estimating all unresolved claims and returning jurisdiction to the bankruptcy court. The March 28, 2007, Order is attached to this Order and is incorporated in full by this reference. This claim having been fully resolved,

IT IS HEREBY ORDERED that this district court case is closed.

DATED this 30th day of March, 2007.

/s/ Robert E. Jones
ROBERT E. JONES
U.S. District Judge

CLERK U.S. BANKRUPTCY COURT
DISTRICT OF OREGON

MAR 2 8 2007

LODGED_____ REC'D_____
PAID_____ DOCKETED___

IN THE UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In Re ) | |
| ) | Bankruptcy Case |
| Roman Catholic Archbishop of Portland in ) | No. 04-37154-elp11 |
| Oregon, and successors, a corporation sole, ) | |
| dba the Archdiocese of Portland in Oregon, ) | |
| ) | |
| Debtor. ) | O R D E R |
| ) | |
| ) | |

JONES, Judge:

By Order entered March 15, 2007, and Supplemental Order dated March 26, 2007, this court withdrew the reference to the bankruptcy court of certain unresolved claims[1] for the limited purpose of estimating, pursuant to 11 U.S.C. § 502(c)(1), those claims for plan confirmation purposes. With this order, I complete the estimation process and return jurisdiction to the bankruptcy court.

---

[1] With the exception of the DuFresne claims, which are discussed in detail below, all of the unresolved claims involved allegations of child sex abuse.

## PROCEDURAL BACKGROUND

As relevant to the estimation proceedings, bankruptcy judge Elizabeth Perris referred this matter to me in late February 2007. After reviewing the parties' submissions and meeting with counsel, I concluded that the key issue with respect to each claim was the claimant's credibility, and the best method for assessing credibility would be to hear the claimant's live testimony on direct and cross-examination, together with other relevant evidence. To accomplish this goal in the expedited manner the bankruptcy court required, I decided that summary "mini-trials," with some claims tried to the court and some claims tried to anonymous advisory juries,[2] would be the best and most efficient approach.

The claimants involved in this estimation proceeding fell into four general categories: (1) those represented by counsel, whose claims would be to advisory juries; (2) pro se prisoner claimants whose claims would be tried to the court via videoconference; (3) pro se claimants not in custody whose claims would be tried in person to the court; and (4) claimants whose claims had already been disallowed or dismissed. With respect to the latter category, I decided to estimate those claims based on written materials.

On February 28, 2007, I entered an order establishing the procedures and schedule for the "mini-jury trial" estimation proceedings, and on March 7, 2007, sent counsel a supplemental order clarifying the procedures and schedule. The jury trials were set to commence on March 13, 2007, and were expected to be completed by March 21, 2007. On March 5, 2007, I entered a separate order governing the procedures for estimating the pro se claimants' claims.

---

[2] The jurors were from the court's regularly scheduled jury pool, and were pre-screened for possible bias through the use of an extensive questionnaire.

2 - ORDER

In the meantime, several claims settled. By the time the first trial commenced on March 13, 2007, 13 claims were scheduled for summary jury trials. The first trial ended with a confidential advisory jury verdict, which I shared with counsel. The second trial took place on the afternoon of March 13, 2007, with deliberations scheduled to begin the morning of March 14, 2007. Early on the morning of March 14, however, I was informed by counsel that eight of the claims had settled, including the two cases (three claims) tried on March 13, 2007.

In the end, all but one case, which involved three claimants, settled. That remaining case was tried to an advisory jury on March 15, 2007. The jury returned a confidential non-unanimous verdict[3] late that day, which I shared with counsel. My estimation of the value of those three claims and the other claims that did not settle, together with my findings pertaining to each of those claims, are set forth below.

1. SETTLED CLAIMS

The following claims have settled and will not, therefore, be estimated:

Claim No. 95
Claim Nos. 243 and 331[4]
Claim Nos. 261 and 553
Claim No. 278
Claim No. 317
Claim No. 432
Claim No. 433
Claim No. 434
Claim No. 435
Claim No. 436

---

[3] Because the jury verdict was to be advisory only, I did not require a unanimous verdict; rather, I asked the jurors to specify each of their decisions in the event they did not concur.

[4] Certain claimants filed two proofs of claim for the same claim and were assigned two claim numbers. Only one estimation for these claims is required.

3 - ORDER

       Claim No. 438
       Claim No. 442
       Claim No. 446
       Claim No. 476
       Claim No. 843
       Claim No. 857
       S.E. (Adv. No. 04-3346)

2. <u>CLAIMS DISMISSED OR DISALLOWED BY THE BANKRUPTCY COURT</u>

Seven claims referred to this court had already been dismissed or disallowed or recommended to be dismissed or disallowed, but remain "active" in the sense that all routes of appeal have not yet been exhausted. I estimate these claims as follows:

<u>Claim Nos. 261 and 324</u>: The bankruptcy court issued a Report and Recommendation to grant summary judgment in favor of debtor on these claims. On <u>de novo</u> review, I concurred with the bankruptcy court in full and granted summary judgment. For the reasons set forth in the Report and Recommendation, I estimate Claim Nos. 261 and 324 at $0.

<u>Claim No. 220</u>: On March 15, 2007, the bankruptcy court entered a Report and Recommendation re Disallowance of Claim 220, based on the claimant's failure to appear or prosecute the claim. The time for objections to the Report and Recommendation has not yet run, consequently, this court has yet to review it. Claim 220 is, therefore, technically still active, but in view of claimant's uniform failure to appear or take any action to prosecute this claim over a two year period, I find that the disallowance of the claim would survive any appeal. I therefore estimate Claim 220 at $0.

<u>Claim No. 291</u>: On January 19, 2007, the bankruptcy court entered a Report and Recommendation re Motion for Summary Judgment on Claim No. 291, based on claimant's failure to controvert debtor's evidence that one of the two priests claimant accused of sexually

4  -  ORDER

abusing him as a minor was never affiliated in any way with the debtor, and the other priest was not under debtor's supervision and control at the time claimant was a minor. After de novo review, the district court entered an order granting summary judgment and disallowing Claim 291. This claim is active only because the time for appeal may not yet have expired. I estimate Claim 291 at $0.

Claim Nos. 275, 282, 283, 462: On January 30, 2007, the bankruptcy court entered a Report and Recommendation re Disallowance as to each of these claims for failure of the respective claimants to appear or otherwise prosecute their claims. On March 7, 2007, the district court entered an Order disallowing each claim. The four claims are active only in the sense that the time for filing appeals has not yet run. I therefore estimate Claims 275, 282, 283, and 462 each at $0.

3.   STATE COURT CLAIMS ON APPEAL IN WHICH DEBTOR WAS DISMISSED

With respect to their claims against *debtor*, as opposed to any other defendants, Claims 143 and 311 both were dismissed by the Multnomah County Circuit Court and are presently on appeal. I did not initially understand that despite their procedural status, these claims required estimation. Having since been informed by the bankruptcy court that these claims must be estimated, I decided to estimate them based on the written materials.

I have reviewed all of the materials relevant to the dismissed claims, and have determined, as I originally stated to counsel, that it would be inappropriate for me to disturb the state court jurisprudence on the issues the state court has decided. Consequently, at the present time and for the purposes of plan confirmation, I estimate the value of Claims 143 and 311 each to be $0.

5 - ORDER

4. **CLAIMS TRIED TO ADVISORY JURY (CLAIM NOS. 473, 474, AND 475)**

The claimants in this case are Nathan DuFresne ("N.D."), and his parents Paul and Deborah DuFresne. In essence, N.D., joined by his parents, claims he was wrongfully expelled from his seventh grade class at St. Thomas More Catholic School. These claimants additionally assert multiple theories for recovery, seeking damages for intentional infliction of emotional distress, fraud, breach of contract, civil conspiracy, negligence and breach of fiduciary duty. Of these legal theories, two - breach of fiduciary duty and intentional infliction of emotional distress - were submitted on instructions to the advisory jury.

    a.    Child Sex Abuse Claim

As a preliminary matter, I address one of these claimants' most forcefully asserted arguments, that a claim for child abuse should have been considered by this court and submitted to the jury. Such a claim in their case has no basis in law or in fact. Judge Perris, in her opinion on estimation procedures dated February 28, 2006, explicitly ruled that based on her review of the complaint[5] and the materials submitted in support of and in opposition to the estimation motion, any claim for child sex abuse was inappropriate. Thus, no valid claim for child sex abuse existed in this case at the time it was transferred to me for estimation. Consequently, at the commencement of the jury proceedings, I explained to the jury that this litigation does not include a claim for child sex abuse. Additionally, no evidence supported submission of such a claim to the jury. The only evidence claimants proffered in an offer of proof was that the school pastor, in a private conference with N.D., patted him on the leg or thigh and perhaps on his

---

[5] The Complaint, which claimants initially filed in state court, reveals that no claim for child sex abuse was alleged. See attached Exhibit A, which is the caption and title page of the Complaint.
6 - ORDER

shoulder. There was no evidence of conversation about sex and no inference that such contact was sexual; moreover, the only consequence was that N.D. felt "uncomfortable." Being called to the principal's office to discuss a student's problems likely would make most any student "uncomfortable." Because nothing justifies any claim based upon child abuse or sex abuse in this case, I estimate no damages on this theory.[6]

    b.    <u>Wrongful Expulsion</u>

N.D.'s only meritorious claim is wrongful expulsion. The school pastor and the school principal had been receiving, from time to time, complaints from parents and other students about the behavior of certain seventh grade boys. The administrators learned of N.D.'s alleged physical and verbal abuse from students in his class, and by some parents responding to the abuse by removing their children from the school. Instead of investigating, identifying, and interviewing specific students who complained of having problems, the school administrators relied on N.D.'s "reputation for being a bully," reports of bad behavior, and one prior disciplinary referral for cheating, for which N.D. received discipline and the matter was closed. The pastor did conduct multiple meetings with the seventh grade boys in various combinations in an effort to resolve the behavior problems. But instead of making specific findings and providing notification in writing to N.D. and his parents, the pastor and the principal simply attempted to counsel N.D. to stop any physical and verbal abuse.

On the other hand, N.D. readily admitted that he intentionally participated in horseplay and wrestling with his classmates, even though he was 5'10" at the time (now 6'5"). He also

---

[6] Despite both Judge Perris' and my rulings that claimants had no claim for child sex abuse, on multiple occasions claimants' counsel violated my rulings by attempting to elicit testimony on the excluded claim.

7 - ORDER

confessed that he repeatedly grabbed and twisted the nipples of fellow classmates until the nipples turned purple, which he called "purple nurples." Oregon law criminalizes such physical assault, see O.R.S. 163.160 et seq, and requires school officials to report such physical abuse of a child to the proper authorities. See O.R.S. 419B.005 et seq. Further, school officials have a "special duty" of supervision to protect students from injury by other students and themselves. See Fazzolari v. Portland School Dist. No. 1J, 303 Or. 1, 734 P.2d 1326, 1337 (1987). Here, there is no evidence that the school administrators memorialized N.D.'s gross misconduct of "purple nurpling" or reported it to the authorities as required by law.

Claimants complain that the pastor's disciplinary discussions with N.D. and other boys were held behind closed doors as if that is somehow inappropriate. As a matter of fact and common knowledge, school administrators are to "praise in public and discipline in private." There is nothing sinister or inappropriate about that practice. What was extremely unwise, however, was for the school administrators to engage in any form of physical touching of N.D. behind closed doors, even though no emotional or physical harm resulted, given that the administrators knew that the parents were prone to litigation and in fact had previously threatened the school with a lawsuit if their daughter was not placed on the waiting list for admission to kindergarten at the school, and had conferred with legal counsel within the year before the expulsion. Although unknown to the school administrators at the time, the parents undoubtedly contemplated litigation when they brought a tape recorder to the final parental meeting with the administrators and illegally tape-recorded the session.[7]

---

[7] Oregon law makes surreptitious recording of conversations a class A misdemeanor, ORS 165.540(1), and prohibits the use of such recordings in any "court of this state." ORS 41.910. Consequently, I did not admit the tape recording for consideration by

8 - ORDER

In any event, I infer from the testimony at trial that this meeting was nothing but a "free-for-all" shouting match, in which the administrators produced no written charges of misconduct by N.D., yet resulted in N.D. and his parents being ordered to leave the premises and not return. Moreover, in addition to their lack of diplomacy and courtesy toward N.D. and his parents, the school administrators failed to follow the Conduct Referral policy of St. Thomas More Catholic Parish School. The Conduct Referral reads in part as follows:

> Conduct Referral
>
> Depending on the nature of the incident the principal or staff member <u>will employ the following procedures in relation to the seriousness of the misbehavior.</u>
>
> 1. Staff members complete a <u>Conduct Referral</u> form detailing the disciplinary issue and actions taken to resolve it. The referral form <u>must be</u> signed by the student, teacher and the parents. The form <u>needs to</u> be returned to the school. <u>Three conduct referrals for minor infractions will automatically require detention to be served. Some actions are of their nature very serious and will immediately require detention to be served.</u>
>
> <u>After 2 detentions are recorded, *an action plan for success* will be initiated after consultation with the principal, parents(s) or guardian, teacher(s), student and any appropriate learning or behavior specialists. Three detentions served will place the student on probation. For probation there will be a conference with the parent(s) or guardian, student, teacher(s), and the principal to review conduct history and plan for cooperation and improvement on student's part. If probation is violated, the student may not be invited to return for the following academic year.</u>
>
> 2. In more serious cases, the principal may employ suspension (in-school or out) or expulsion from the school.

---

anyone. Apparently, the parents were more interested in vengeance than monetary relief. Not only did they attend the parent conference intending to surreptitiously record it, but according to the testimony of Jan Hines, Deborah DuFresne's last words as she left the Archdiocese offices was a threat to "get [the pastor] no matter how long it took to do so."

9 - ORDER

> In-school suspension removes the student from the classroom to another designated room for up to three days. Out-of-school suspension removes the student from school for up to five days. The parent or guardian is informed as soon as possible of the removal and the reason for the action. The parent, principal and teacher(s) may arrange for a conference and the student may be asked to be included. If a solution seems possible, the student may resume attendance on probation or on a contract. In addition, the student is responsible for completing academic work which was assigned during suspension.
>
> 3. *No matter how cautious and fair the department policy is, there will be some mitigating factors. The principal and Pastor are the final recourse in all disciplinary situations and may waive any and all regulations for just cause at their discretion, if discretion is ever needed.*
>
> Per Oregon law, Catholic schools have the right to ask a student to leave the school. With limited budget *and resources*, we are not able to have a team of counselors and special education experts on staff. Therefore, we may not be able to meet the needs of all students, especially those who chronically disrupt the learning environment or threaten the psychological and/or physical safety of others. In such cases, the school may recommend a more appropriate placement or may terminate the student's enrollment.

Defendant's Exhibit 104 (emphasis in original Exhibit)

This carefully written policy clearly calls for specific conduct referrals, which must be signed by the student, the teacher, and the parents. The referral policy also requires that after two detentions are <u>recorded</u>, an action plan will be initiated after a consultation that includes the parents. Here, no specific misbehavior was recorded and no "action plan for success" initiated.

Even after three detentions a student is simply placed on probation, which once again requires a conference with the parents, presumably after notice of the new violation, a requirement that the school administrators again totally ignored. Paragraph 2 of the conduct referral policy does not provide the debtor with an escape hatch for the failure to carry out school

10 - ORDER

policy. That paragraph contains no criteria for permanent expulsion in lieu of suspension, and it is plausible to expect that before the draconian action of expulsion is executed, the administrators would compile a complete record of the student's behavior and provide an opportunity for the student and parents to respond.

Paragraph 3 of the conduct referral policy provides that as a final recourse, the principal and pastor may exercise their discretion and waive some or all of the regulations, but there is a duty (fiduciary or not) to exercise discretion with fairness. In this case, even up to the administrators' final meeting with the parents there had been no notification to them of specific misbehavior involving N.D., naming time, place and persons present. Thus, I find that discretion was never exercised.

To compound the situation, when the parents bitterly complained directly to the Archdiocese, Robert Mizia, Superintendent of Catholic Schools, responded in a letter noting that the pastor and principal had been receiving complaints from other parents about N.D.'s behavior involving physical and verbal abuse of students in his class and that some of the parents had responded by removing their children from the school, otherwise completely stonewalling the parents as to any specific facts or actions. The letter, defendant's Exhibit 104 (attached to this order as Exhibit B) demonstrates a complete abdication by the Archdiocese to leave all disciplinary matters to the discretion of the school administrators. Thus, responsibility for the wrongful nature of N.D.'s expulsion rests both with the pastor and principal at St. Thomas More and with the Archdiocese of Portland in Oregon.

c.  Intentional Infliction of Emotional Distress

In their shotgun approach for a theory for recovery of damages, claimants also include a claim for intentional infliction of severe emotional distress. As set forth in Patton v. J.C. Penney Co., 301 Or. 117, 719 P.2d 854 (1986), the standard for intentional infliction of emotional distress is as follows:

> First, ordinarily a plaintiff must allege that a defendant intended to inflict severe mental or emotional distress. It is not enough that he intentionally acted in a way that causes such distress. Second, a defendant's act must in fact cause a plaintiff severe mental or emotional distress. Third, a defendant's actions must consist of some extraordinary transgression of the bounds of socially tolerable conduct or the actions must exceed any reasonable limit of social toleration.

Patton, 719 P.2d at 857.

Although there is ample evidence of negligence or failure to follow proper procedures, there is not a scintilla of evidence that the school administrators or the Archdiocese intentionally tried to harm N.D. or his parents, or that their actions consisted of some extraordinary transgression of the bounds of socially tolerable conduct. There is no liability under this theory, and thus no damages, compensatory or punitive.[8]

d.  Damages

The advisory jury was unable to reach a unanimous verdict on N.D.'s claim in this case. Thus, I have made my own independent evaluation of his damages. My impression is that N.D.

---

[8] Claimants also seek damages on a theory of negligent hiring and/or wrongful retention of the administrators at St. Thomas More. I decline to award damages under this theory for two reasons. First, claimants failed to make any meaningful offer of proof that anyone was negligent in hiring these administrators. Second, even if they had, any damages that would be recoverable would duplicate the damages I estimate for wrongful expulsion. In addition, punitive damages are not allowed for negligent acts.

12  -  ORDER

is an exceptional young man who should have never been expelled from St. Thomas More in the manner utilized. I do not doubt that he was perceived as a rowdy bully and that he engaged in serious physical abuse to other students while at St. Thomas More. Nevertheless, his expulsion was wrongful and he has and will sustain damages because of that expulsion.

People are often asked in job and academic applications, in personal histories, and elsewhere to list any expulsions. Even though this strong-minded, resilient young man went to only four therapy sessions related to this event, the stigma of a school expulsion can last a lifetime. N.D. encountered the usual adjustments moving from grade school to high school (when his grades dropped temporarily), but he has since risen to be a 4.0 student and he has become one of the great high school athletes at Beaverton High School, where he has obtained his varsity letter as early as a sophomore. In addition, he apparently enjoys an excellent reputation at his high school and has found many new friends, and evidently no longer engages in the childish behavior he engaged in as a seventh grader. Notably, however, the insensitive treatment he received at St. Thomas More from persons in authority has soured his religious views and his family now attends a Presbyterian church and have forsaken the Catholic faith.

Non-economic damages are exceedingly difficult to appraise, particularly contemporary values for emotional injury. The advisory jury's verdict ranged in awards from $0 to $200,000 for N.D., but were unanimous in awarding $0 to the parents, probably because claimants' counsel asserted to the jury in closing arguments that the parents were not interested in money damages. Whether the parents were or are interested in money damages is irrelevant, however, because I find the parents have no independent cause of action. It would set a terrible precedent to allow parents to recover damages every time some child had allegedly been wronged by school

13 - ORDER

authorities.

In sum, having carefully reviewed all of the written record and all of the exhibits relevant to these claims, and having presided over the advisory proceeding I conclude that N.D.'s damages should be estimated at $100,000. Punitive damages are inappropriate for this cause of action. Accordingly, I estimate Claim 473 at $100,000, Claim 474 at $0, and Claim 475 at $0.

IT IS SO ORDERED.

DATED this 25th day of March, 2007.

_____
ROBERT E. JONES
U.S. District Judge

14 - ORDER

MAY 1 2 2004

TRUE CHARGES ✓

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| Nathan DuFresne, a minor, by and through his parents Paul and Deborah DuFresne, Paul E. DuFresne, an individual, and Deborah J. DuFresne, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> Archdiocese of Portland in Oregon, Archbishop John Vlazny, an individual, Priest Michael P. Johnston, an individual, Frank Murray, an individual, the St. Thomas More School, the St. Thomas More Parish, Does 1 - 5, <br><br> Defendants. | Case No. **0405-04846** <br><br> COMPLAINT (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (ABUSE); FRAUD, BREACH OF CONTRACT; CIVIL CONSPIRACY, NEGLIGENCE, BREACH OF FIDUCIARY DUTY) <br><br> (Not Subject To Mandatory Arbitration) <br><br> Jury Trial Demanded |

Plaintiff alleges as follows:

## GENERAL ALLEGATIONS

1.

Nathan DuFresne ("Nathan") is a 13 year old residing in Oregon, who in the 2003-2004 school year was attending the St. Thomas More School ("STM School"). Paul E. DuFresne ("Paul") and Deborah J. DuFresne ("Deborah", together with Nathan and Paul, the "DuFresnes") are Nathan's parents and reside in Oregon. Deborah and Paul are suing on their own behalf as well as on behalf of and for their minor child Nathan.

1 - COMPLAINT
[CDufresneSTM 051104 final]

MULLEN LAW FIRM, P.C.
8225 S.W. Fairway Dr. Ste 100
Portland, Oregon 97225
(503) 297-4594

EXHIBIT A
15 - ORDER

CONFIDENTIAL
Subject To
Protective Order

ARCH-DuFresne
040


## ARCHDIOCESE OF PORTLAND IN OREGON



Office of the Superintendent

March 25, 2004

Mr. and Mrs. DuFresne
5135 SW 85th Avenue
Portland, Oregon 97225

Dear Mr. and Mrs. DuFresne,

Please excuse my delay in getting back to you, but I have been on the road and wanted to give adequate time to review the situation concerning your son, Nathan.

I have spoken with Frank Murray and Father Michael Johnston about the circumstances that led up to Nathan's dismissal from the school. For some time the pastor and principal had been receiving complaints from other parents about Nathan's behavior. Specifically, they learned of Nathan's physical and verbal abuse of students in his class as well as other students. Some parents responded by removing their children from St. Thomas More School. In light of these serious concerns, it was considered to be in the best interests of the school to request that you withdraw Nathan. I understand that, because you were not willing to do so, expulsion was necessary.

As I explained to you in our phone conversation on Friday, February 27, 2004, Department of Catholic Schools respects site-based management of parish schools. The canonical authority of the Pastor is operative in decision making. The Department of Catholic Schools provides guidelines and consults with schools on various issues. However, it is at the sole discretion of the school to accept and/or to dismiss students at any time.

I reviewed the St. Thomas More School Policies Handbook on dismissal of students. It asserts the rightful role of parish/school administrators in making the final interpretation and determination of school disciplinary and other policy. As stated on page 34, item #3 under "Conduct Referral":

> "The principal and Pastor are the final recourse in all disciplinary situations and may waive any and all regulations for just cause at their discretion, if discretion is ever needed. Per Oregon law, Catholic schools have the right to ask a student to leave the school. With a limited budget and resources, we are not able to have a team of counselors and special education experts on staff. Therefore, we may not be able to meet the needs of all students, especially those who chronically disrupt the learning environment or threaten the psychological and/or physical safety of others. In such cases, the school may recommend a more appropriate placement or may terminate the student's enrollment."

EXHIBIT __C__
PAGE __1__ OF __2__

ARCH-DuFresne
027

2838 E. Burnside Street, Portland, Oregon 97214-1895   503/234-5334   Fax 503/234-2545

EXHIBIT B, Page 1
16 - ORDER

In closing, I know that this has been and is a difficult decision to accept. However, my review indicates that it was made by proper authorities in the best interests of St. Thomas More School. Their decision remains final.

May God bless your family with peace and strength as you move ahead, and may He guide you with wisdom.

Sincerely,

Robert L. Mizia
*Superintendent of Catholic Schools*

RM:jh

EXHIBIT __C__
PAGE _2_ OF _2_

ARCH-DuFresne
028